IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

```
------------------------------------------------------  :
KATHY M. DOBROWOLSKI,                 : CASE NO. 1:08 CV 1418
                                      :
                    Plaintiff,        :
                                      :
          -vs-                        : MEMORANDUM OF OPINION AND
                                      : ORDER ADOPTING REPORT AND
                                      : RECOMMENDATION AND
COMMISSIONER OF SOCIAL                : REMANDING FOR FURTHER
SECURITY,                             : PROCEEDINGS
                                      :
                    Defendant.
------------------------------------------------------
```

UNITED STATES DISTRICT JUDGE LESLEY WELLS

Plaintiff Kathy M. Dobrowolski challenges the Commissioner of Social Security's

("Commissioner") denial of her application for Supplemental Security Income.  (Docket

No. 1, Complaint).  This matter was automatically referred to United States Magistrate

Judge George J. Limbert for a Report and Recommendation ("R&R"), pursuant to Local

Civil Rule 72.2(b).  In his R&R, Magistrate Judge Limbert recommended this Court

remand the case, because the Administrative Law Judge ("ALJ") erred when he failed to

address County Medical Services' ("CMS") determination that Ms. Dobrowolski was

qualified for benefits on account of her disability.  (Docket No. 17 at 13, R&R).  The

Magistrate Judge also recommended this Court remand the case for additional fact

finding, evaluation, and analysis, because the ALJ failed to clearly explain his reasons for rejecting Ms. Dobrowolski's testimony as incredible, pursuant to Felisky v. Bowen. (R&R at 13).  Lastly, the Magistrate Judge recommended that this Court remand so that the ALJ might reevaluate Ms. Dobrowolski's Residual Functional Capacity ("RFC") to the extent that the ALJ's proper consideration of the CMS disability determination and Ms. Dobrowolski's credibility might bear on that analysis. Id.

In his timely filed objections, the Commissioner argues that the ALJ's failure to explicitly consider the CMS disability determination was harmless error, as the ALJ had considered the medical opinion that formed the basis of the CMS disability determination.  (Docket No. 18 at 2-3, Objections).  The Commissioner also objects to the conclusion that the ALJ did not adequately explain his adverse credibility determination as to Ms. Dobrowolski's statements concerning the intensity, persistence, and limiting effects of her symptoms.   (Objections at 3-6).  On this point, the Commissioner claims that the ALJ did adequately explain his credibility finding, when he noted lack of objective support for her subjective complaints of pain, evidence that she responded positively to treatment, the conclusion of the state psychologist that she was malingering, and inconsistencies between Ms. Dobrowolski's testimony and her prior statements about her medical conditions.  Id.

For the reasons stated herein, the Court will adopt Magistrate Judge Limbert's R&R in its entirety and remand to the Commissioner for further proceedings consistent with this opinion.

**I. Background**

    **A. Medical History**

    The plaintiff Ms. Dobrowolski was born 15 July 1962.  (Tr. 73).  At the time of her testimony, she was living with her boyfriend, and her three adult children were living outside the home.  (Tr. 551-52).  She did not finish high school, having completed only part of the ninth grade, and while in school she attended classes for slow learners. (Tr. 533).  Ms. Dobrowolski testified that she has difficulties with reading and comprehension, particularly with "big words."  (Tr. 551).  Her SSA disability report and her testimony indicate that she has no past work experience.   (Tr. 88-89; 548).

    Since at least 2001, Ms. Dobrowolski has sought treatment for numerous physical and psychological ailments, including partial amputation of her right long finger, migraine headaches, chronic obstructive pulmonary disease and asthma, cervical degenerative disc disease, hypothyroidism, acid reflux, plantar fasciitis, and panic attacks.  The Court will describe those portions of Ms. Dobrowolski's medical history that are relevant to its inquiry and note, in particular, her recurrent problems with migraine headaches.  With respect to this ailment, described below are the objective evidence, the opinions of the physicians and other professionals who saw her, and Ms. Dobrowolski's testimony and subjective complaints.

    **1. Migraine Headaches**

    A review of the record reveals that Ms. Dobrowolski has a long history of seeking medical care for headaches.  On 29 November 2001, she visited the emergency room at Deaconess hospital and reported nausea, photophobia, and pain in the frontal area of

the forehead.  (Tr. 432).  It was reported that her headache was "one of the worst she ever had," but that she did not experience this sort of headache frequently.  Id.  A CT scan of Ms. Dobrowolski's brain revealed no abnormalities, and the emergency room physician's preliminary clinical impression was "severe headache, probably migraine." (Tr. 433).  After prescribing Vicodin for pain, he sent her home.  Id.

On 3 December 2001, Ms. Dobrowolski presented her situation to Augusto C. Juguilon, M.D., a board certified neurologist.  (Tr. 219).  Dr. Juguilon described her complaint as a "throbbing, pounding, tight, binding, bi-frontal retro-orbital" headache. (Tr. 220).  Dr. Juguilon reviewed Ms. Dobrowolski's EEG and reported that it was abnormal and "consistent with left temporal lesion."  (Tr. 221).  He prescribed Cyproheptadine and Imitrex.  (Tr. 220).  During a second visit later that month, Dr. Juguilon noted that "[s]he still has persistent headaches."  (Tr. 218).

On 29 March 2005, Ms. Dobrowolski presented her symptoms to Romeo Craciun, D.O., with complaints of "throbbing, pounding" headaches, accompanied by nausea and "white flashes" in front of her eyes.  (Tr. 399).  She further reported increased frequency and intensity of the headaches.  Id.  Dr. Craciun's impression was that she was suffering from migraine headaches. (Tr. 400).   He reviewed Ms. Dobrowolski's MRI and MRA, both of which proved to be normal.  Id.  He started her on Depakote and ordered that she remain on Relpax.  Id.  She again visited Dr. Craciun on 10 October 2005 and he noted that "she has been doing fine."  (Tr. 419).  He indicated that she occasionally uses Tylenol-3 for headaches, and he further prescribed Depakote

to prevent migraines.  Id.  Dr. Craciun noted that Ms. Dobrowolski had "reasonable control" of her headaches.  Id.  She returned to Dr. Craciun on 7 March 2006, 28 March 2006, and 15 May 2006, presenting with headaches on each visit.  (Tr. 418; 417; 416).

On 19 February 2007, Ms. Dobrowolski visited the Marymount Hospital Emergency Room, complaining of a headache unrelieved by any medication.  (Tr. 477).  She was treated with Demerol and released.  (Tr. 479).  On 12 March 2007, she presented to Dr. Mirela Rossi, who noted that she had lost 40 pounds and that her migraines were getting worse.  (Tr. 508).  Dr. Craciun again saw Ms. Dobrowolski on 15 March 2007 and noted that she had good but limited control over her migraines. (Tr. 492).  He increased her dosage of Depakote, started her on Topamax, and prescribed Vicodin as needed.  (Tr. 492-93).  On 24 March 2007, she returned to the Marymount Emergency Room again complaining of headaches and photosensitivity.  (Tr. 472).  An MRI of her brain on 28 March 2007 was normal.  (Tr. 489).

### 2. Ms. Dobrowolski's testimony

Ms. Dobrowolski stated that her headaches occur randomly about two or three times a week, and they can last for up to 12 hours.  (Tr. 540).  Sometimes the headaches cause vomiting.  Id.  When they occur, she will go to her room, close the shades, and simply wait for relief.  Id.  Sometimes, she uses ice packs or tries to sleep it off. (Tr. 542).  Ms. Dobrowolski stated that she takes various prescription medications for her migraines, including Depakote, Topomax, and Vicodin ES.  (Tr. 541).  Ms. Dobrowolski attested that, all in all, she is out of commission for at least two days a week.  (Tr. 540).

5

Ms. Dobrowolski also testified that her medications make her dizzy and lightheaded.  (Tr. 549).  She stated that taking Ativan three times a day makes her tired and that she takes naps daily for an hour or two.  Id.  She also performs four daily treatments with a nebulizer[1] to treat her COPD, each of which takes 20-25 minutes. (Tr. 543).

Ms. Dobrowolski stated that on a typical day she gets up in the morning, performs a breathing treatment, and takes her other medication.   (Tr. 546).  If she is afflicted with a migraine she will "end up laying around all day."  Id.  However, she stated that at times she functions "pretty well" if she does not have a migraine or if her neck does not bother her.  Id.

### 3. The Assessment by Dr. Wax

Mitchell Wax, Ph.D., examined Ms. Dobrowolski on 18 October 2004.  (Tr. 301-06).  Dr. Wax repeatedly mentioned his suspicions that Ms. Dobrowolski was malingering, based on the fact that she has no work history and "could not provide information about what she has been doing with her life for the past ten years."  (Tr. 302).  He also noted her inability or unwillingness to explain how her family obtains an income sufficient to pay a home mortgage.  (Tr. 301).  According to Dr. Wax, she and her common law husband live off of his $232 a month disability check, and sometimes they receive financial assistance from her father.  Id.  Their mortgage and bills are around $600 a month.  Id.  Because she had not fully accounted for the difference between income and expenses, Dr. Wax suspected malingering.  Id.  When Dr. Wax

---

[1]     A nebulizer is a device which administers medication in the form of a fine mist directly into the lungs.

administered a digit span test, he believed that Ms. Dobrowolski may have intentionally reversed digits and noted suspected malingering.  (Tr. 303).  Furthermore, Ms. Dobrowolski's vagueness about how she spends her typical day and her annoyance toward answering questions on the subject also raised Dr. Wax's suspicions.  (Tr. 304). According to Dr. Wax, because she failed to report any daily activities beyond going to the grocery store, cooking, cleaning, performing breathing treatments, sitting and rocking, and watching television, malingering was suspected.  Id.

Dr. Wax noted that Ms. Dobrowolski takes care of her family and "clean[s] constantly," but her son does the dishes and the laundry.  (Tr. 302, 304).  It was reported that she bathes daily, sorts the clothes, vacuums two to three times a day, mops weekly, and cleans the bathroom twice a week.  (Tr. 304).  Dr. Wax noted that she cooks and bakes daily and that she takes care of a flower garden "on days I feel good."  Id.  Dr. Wax also reported that she "is able to run out and get things," but only "when she feels okay."  (Tr. 303).

Dr. Wax indicated that Ms. Dobrowolski complained of asthma and COPD, migraine headaches, stomach problems, and thyroid problems.

### 4. Dr. Casselberry's Opinion and the County Medical Services Disability Finding

In November 2003, Dr. Casselberry prepared an assessment of Ms. Dobrowolski's physical abilities and concluded that she was "unemployable."  (Tr. 150). He reached this conclusion based on his consideration of medical impairments involving the fusion of her right long finger, plantar fasciitis and removal of a lesion on her right foot, and hypothyroidism.  (Tr. 149).  Dr. Casselberry opined that she had difficulty with

7

weight bearing.  (Tr. 150).  She could stand or walk for 2-3 hours in an 8 hour period and for one hour uninterrupted.  Id.  He noted that she can sit for 3-4 hours in an 8 hour period, and for 1-2 hours uninterrupted.  Id.  He found her extremely limited in her ability to push, pull, and handle objects, and markedly limited in her ability to engage in repetitive foot movements.  Id.

Ms. Dobrowolski applied for disability through County Medical Services ("CMS") on 8 November 2004.  (Tr. 139).  On 4 February 2005, the agency concluded that she met the disability criteria as of 1 January 2004.  This determination of disability appears to have been based largely, and possibly completely, on the findings of Dr. Casselberry as recorded in his November 2003 report.  (Tr. 137-153).  The Commissioner contends that Dr. Casselberry's report forms the basis for the disability determination (Docket No. 18 at 3), and Ms. Dobrowolski offers nothing to the contrary.  The only other items included among the CMS documents are the County Medical Services Tracking System form, which contains basic information identifying the plaintiff and her disability, and the County Medical Services Disability Determination form, which also identifies Ms. Dobrowolski and the onset date of her disability.  (Tr. 140).

### B. The ALJ's Ruling

Ms. Dobrowolski applied for SSI on 11 May 2004, alleging disability beginning 26 February 1999 due to migraines, problems with her finger, asthma, acid reflux and back pain.  (Tr. 61, 73-85, 88).  The Social Security Administration (SSA) denied her claims and affirmed the denials upon reconsideration.  (Tr. 59-63, 65-68).   Ms. Dobrowolski

8

requested a hearing before an ALJ.  (Tr. 526).  At the 11 May 2007 hearing she testified

while represented by counsel.  (Tr. 526).  A vocational expert also testified.  (Tr. 526).

After the hearing, the ALJ issued a written opinion dated 24 May 2007, denying

Ms. Dobrowolski's application for SSI and finding that she does not have a disability that

would entitle her to benefits.  (Tr. 14-23).  The ALJ concluded that Ms. Dobrowolski

possessed the residual functional capacity to:

> sit, stand and/or walk 6 hours each in an 8 hour workday and [she] can lift, carry, push and/or pull 10 pounds frequently and 20 pounds occasionally. She is precluded from using ladders, ropes and scaffolds, from exposure to workplace hazards such as unprotected heights and unprotected moving machinery, and from occupational driving. She must avoid concentrated exposure to fumes, odors, dust, gases and poorly ventilated areas and to temperature extremes (temperatures in excess of 85 degrees or less than 32 degrees Fahrenheight (sic)). She is limited to occasional fingering and feeling operations with her right, dominant hand. She is limited to low stress tasks and is precluded from tasks that involve negotiation, arbitration, confrontation, directing the work of others, or being responsible for the safety of others.

(Tr. 17).

Because Ms. Dobrowolski's disability claim was based in part on her subjective

complaints of pain, the ALJ was required to follow a two step inquiry before reaching the

above stated conclusion.  First, the ALJ considered whether there was an underlying

medically determinable physical or mental impairment that could reasonably be

expected to produce the claimant's pain or other symptoms.  20 C.F.R. 416.929(a); SSR

96-7p.  Second, after answering the first question in the affirmative, the ALJ was

required to evaluate the intensity, persistence, and limiting effects of Ms. Dobrowolski's

symptoms.  20 CFR 416.929(c); SSR 96-7p.  In order to properly address this question,

Social Security regulations require that the ALJ assess Ms. Dobrowolski's credibility,

based on a consideration of the entire record.  20 CFR 416.929(c); SSR 96-7p.

9

The ALJ indicated that he made the requisite assessment with the following declaration: "Ms. Dobrowolski's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 18).  The ALJ did not explicitly offer any further explanation as to why he chose to discredit Ms. Dobrowolski, but this statement was followed by a synopsis of her medical history, which included a description of various pieces of evidence relevant to the pain she experiences from migraine headaches.  (Tr. 19-21).  In pertinent part, that description is as follows:

> Diagnostic evaluation of Ms. Dobrowolski's headaches included a CT scan of her brain after she presented to the emergency room with complaints of a severe headache on November 29, 2001.  The CT scan was negative and she responded to treatment in the emergency department (Exhibit B29F, 5-9).  An EEG was done on December 7, 2001 and showed a left temporal lesion (Exhibit B7F, 5).  She was treated with Vicoden and Imitrex for her headaches (Exhibit B9F, 14-15).  While the EEG showed a left temporal lesion, subsequent tests did not.  An MRI/MRA of her brain performed on October 5, 2004 was unremarkable (Exhibit B20F, 6-7).

> She was referred to the neurologist Romeo Craciun, M.D., and he examined her on March 29, 2005.  She reported a 4-5 year history of recurrent headaches that were increasing in frequency.  On examination, her gait was normal and she turned and changed direction without difficulty.  The entire neurological examination was unremarkable and Dr. Craciun indicated that her MRA/MRI was normal (Exhibit B24F, 10-11).

> Dr. Craciun saw Ms. Dobrowolski on March 14, 2007, and he noted that she maintained good, but limited control of her headaches.  She said that the headaches occurred at random and she occasionally threw up.  Neurological examination was normal and she was discharged on Depakote.

> On March 24, 2007, Ms. Dobrowolski presented to the emergency room complaining of headache recalcitrant to medication.  She was treated with Demerol and released after the pain resolved (Exhibit B33F, 2-12).

> An MRI of her brain on March 28, 2007 was normal (Exhibit B35F, 5).

10

* * *

At the bureau's request, Ms. Dobrowolski was seen by Mitchell Wax, Ph.D., on October 18, 2004. She reported having migraines, asthma, COPD, and probable surgery to the middle finger of her right hand.  Several times in his report, Dr. Wax indicated that he suspected malingering by Ms. Dobrowolski.  He noted that she had no work history and stated that she never held a job.  He indicated that he suspected malingering because she could not provide information about what she had been doing with her life for the past ten years or how she was able to obtain a mortgage without an income.  He indicated the possibility of intentional reversals when she recalled digits and again he suspected malingering.  He wrote, "No assessment of her cognitive functioning could be made due to possible malingering.  This individual appeared to intentionally reverse numbers on Digit Span forward and backward."  Dr. Wax opined that an assessment of several areas of functioning could not be assessed due to malingering, although he indicated that her ability to relate to others was moderately impaired.  (Exhibit B16F, 1-6).

(Tr. 19, 21).

In addition, at no point in his written opinion did the ALJ mention the CMS finding of disability.  He did, however, address Dr. Casselberry's medical opinion, which the Commissioner claims formed the basis of the CMS disability ruling.  (Tr. 19; Objections at 2-3).

### C. Magistrate Judge Limbert's Report and Recommendation and the Commissioner's Objections

In his R&R, Magistrate Judge Limbert first recommended that the Court remand the case because the ALJ failed to consider the disability determination of County Medical Services.  (R&R at 5-6).  The R&R points out that under Social Security Regulation 06-03p the ALJ must consider a finding of disability by another agency and provide reasons for rejecting it.  Id.  Commissioner concedes that the ALJ did not explicitly address the CMS disability determination in his opinion, but he contends that this error was harmless.  (Objections at 2).  The Commissioner maintains that because

11

the CMS disability determination was based on the medical opinion of Dr. Casselberry, which the ALJ properly addressed and rejected, the ALJ implicitly provided reasons for rejecting the CMS finding.  (Objections at 2-3).  As a result, the Commissioner argues, it would be an idle gesture for the Court to order remand on this issue.  Id.

Secondly, Magistrate Judge Limbert recommended the Court remand the case because the ALJ failed to properly explain why he found that Ms. Dobrowolski was not entirely credible.  (R&R at 7).  According to the R&R, the ALJ "did not specifically state why he discounted the Plaintiff's complaints, including her complaints of migraine headaches, their frequency, and the resulting work-related limitations."  Id.  In his objections, the Commissioner contends that the ALJ did properly explain why he discounted Ms. Dobrowolski's testimony, when he noted lack of objective support for her subjective complaints of pain, evidence that she responded positively to treatment, the conclusion of the state psychologist that she was malingering, and inconsistencies between Ms. Dobrowolski's testimony and her prior statements about her medical conditions.  (Objections at 3-6).

## II. Judicial Review

Under 28 U.S.C. § 636(b)(1)(C), this Court must make a de novo determination of those portions of the report and recommendation to which objection is made.  "[T]he court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).   This task calls for a reexamination of all the relevant evidence, previously reviewed by the magistrate judge. Lashley v. Sec'y of Health and Human Srvcs., 708 F.2d 1048, 1053 (6th Cir.1983).

12

Review proceeds along two lines.  First, the Court must determine whether substantial evidence in the administrative record supports the ALJ's factual findings, and, second, whether the ALJ "applied the correct legal criteria."  Bowen v. Comm'r. of Soc. Sec., 478 F.3d 742, 745 46 (6th Cir.2007).  "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Id. at 746 (citing in part Richardson v. Perales, 402 U.S. 389, 401 (1971)). It consists of " 'more than a scintilla of evidence but less than a preponderance . . . '" Rogers v. Comm'r. of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not de novo. See Cutlip v. Secretary of Health & Human Servs., 25 F.3d 284, 286 (6th Cir.1994). Whether the Court agrees or disagrees with an ALJ's factual findings or whether the administrative record contains evidence contrary to those findings is irrelevant to this inquiry.  Rogers, 486 F.3d at 241.  Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence."  Rogers, 486 F.3d at 241 (citing Her v. Comm'r. of Soc. Sec., 203 F.3d 388, 389-90 (6th Cir.1999)).

The second line of judicial inquiry reviewing the ALJ's legal criteria may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  See Bowen, 478 F.3d at 746.  This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  Id. (citing Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 546-47 (6th Cir.2004)).

### III. Law and Argument

#### A. The ALJ's failure to consider the CMS disability determination

The Court must consider whether the ALJ committed reversible error when he failed to consider CMS's finding that Ms. Dobrowolski was disabled.  There are two parts to this inquiry: first, whether this failure in fact constituted error, and second, if the ALJ did err, whether his error was harmless.

While it is clear that CMS's decision to award benefits to Ms. Dobrowolski would not be binding on the Commissioner, pursuant to 20 C.F.R. § 404.1504, the ALJ is still required to consider the CMS decision.   As stated in a Policy Interpretation Ruling by the SSA, "evidence of a disability decision by another governmental or non-governmental agency cannot be ignored and must be considered."  SSR 06-03p, 2006 WL 2329939 at *6 (S.S.A.).  Furthermore, "the adjudicator should explain the consideration given to [the disability decisions of other agencies] in the notice of decision."  Id. at *7.  Federal courts routinely find that failure to comply with this mandate constitutes error.  See, e.g., See Harris v. Heckler, 756 F.2d 431, 434 (6th Cir. 1985); McCartey v. Massanari, 298 F.3d 1072, 1076 (9th Cir. 2002); Baca v. Dept. of Health and Hum. Svcs., 5 F.3d 476, 480 (10th Cir. 1993); Rothgeb v. Astrue, 626 F.Supp.2d 797, 809-10 (S.D. Ohio 2009).  Therefore, the Court finds that the ALJ did err when he failed to consider the CMS decision.

Although the ALJ erred, the Court will not remand on this basis if the error was harmless.  Remand is appropriate when "the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses."  Connor v.

14

United States Civil Serv. Comm'n, 721 F.2d 1054, 1056 (6th Cir. 1983).  The

Commissioner maintains that the error was harmless, because the CMS disability

determination was based on the medical opinion of Dr. Casselberry, which the ALJ

properly addressed and rejected.  (Objections at 2). Therefore, the ALJ implicitly

provided reasons for rejecting the CMS finding.  Id.

 If the Commissioner is correct that the CMS disability determination is comprised

only of Dr. Casselberry's opinion and the two administrative documents noted *supra* §

I.A.4, then Ms. Dobrowolski has not been prejudiced by the ALJ's failure to explicitly

consider the CMS disability ruling.  Neither document contains substantive medical

information that could bear on the analysis as to whether she is disabled, and both

documents simply identify Ms. Dobrowolski and indicate a finding of disability.

 Furthermore, it is notable that the only alleged impairment that is common to both

her CMS application and her Social Security application involves the difficulty she was

experiencing with her finger.  (See Tr. 88, 149).  Therefore, even if the CMS file as it is

presented in the record is incomplete, any additional documents that might have been

included could only bear on the Commissioner's analysis of that particular impairment.

Given that Ms. Dobrowolski had not yet undergone the partial amputation of her finger at

the time of the CMS finding, it is unclear whether the ALJ's analysis, which occurred

after the partial amputation, would be at all affected by consideration of any document

that may have been part of the CMS papers.

 Nonetheless, it is noted that "a procedural error is not made harmless simply

because [the aggrieved party] appears to have had little chance of success on the

merits anyway."  Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 546 (6th Cir.

15

2004)(quoting <u>Mazaleski v. Truesdell</u>, 562 F.2d 701, 719 n. 41(D.C. Cir. 1977)). Because it is not clear as to whether the CMS documents included in the record are complete, and given that this circuit demands consideration of the disability findings of other agencies, the Court will require that the Commissioner consider it in its entirety.

### B. Did the ALJ fail to clearly state his reasons for discrediting Ms. Dobrowolski's testimony?

The R&R advises that this Court remand on the grounds that the ALJ failed to properly explain his decision to discredit Ms. Dobrowolski's testimony regarding the intensity, persistence, and limiting effects of her symptoms.  (R&R at 7).  Specifically, the R&R points to her testimony as to the pain she experiences from her migraine headaches.  <u>Id.</u>  The R&R indicates that the ALJ's summary dismissal of this testimony failed to meet the standard under <u>Felisky v. Bowen</u>, 35 F.3d 1027 (6th Cir. 1994), which requires that the ALJ clearly state his reasons for rejecting or discounting a claimant's subjective complaints of pain.  The R&R advises that the Court remand so that the Commissioner may properly evaluate Ms. Dobrowolski's credibility.

When evaluating subjective complaints of disabling pain, the ALJ is required to employ a two-part analysis.  <u>Duncan v. Sec'y of Health and Human Srvcs.</u>, 801 F.2d 847, 853 (6th Cir. 1986).  First, the ALJ must ask whether there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms.  <u>Id.</u>  Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities.  <u>Id.</u>  When a disability

16

determination cannot be made on the basis of objective medical evidence, the ALJ must analyze the claimant's credibility.  Id.; SSR 96-7p.  It is for the ALJ and not the reviewing court to make such an analysis.  Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997).  To do so, the regulations require that the ALJ consider a variety of factors, including, the claimant's daily activities; the location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; and treatment of measures, other than medication, taken to relieve pain.  20 C.F.R. 416.929(c)(3)(i)-(vi); SSR 96-7p, 1996 WL 374186, at *3.

An ALJ's credibility findings are to be accorded great weight and deference, because an ALJ is afforded with the opportunity to observe a witness's demeanor. Walters, 127 F.3d at 531.  However, as already noted, if an ALJ chooses to reject a claimant's testimony as incredible, he must clearly state his reasons for doing so. Felisky, 35 F.3d at 1036.  Social Security regulations state that an ALJ's decision be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, 1996 WL 374186, at *4.  It is not sufficient for the ALJ to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are not credible."  Id. at 2.

The Sixth Circuit Court of Appeals emphasizes that the ALJ's articulation of reasons for crediting or rejecting a claimant's testimony "is absolutely essential for meaningful appellate review."  Hurst v. Sec. of H.H.S., 753 F.2d 517, 519 (6th Cir. 1985) (citing Zblewski v. Schweiker, 732 F.2d 75, 78 (7th Cir.1984)).  Furthermore, the

17

inclusion of "specific reasons" in the written decision indicates to a reviewing court that the ALJ in fact made a proper credibility assessment.  See Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 249 (6th Cir. 2007); Zblewski v. Schweiker, 732 F.2d 75, 78-79 (7th Cir. 1984).  An absence of reasoned explanation for rejecting a claimant's testimony tends to show that the ALJ simply did not consider it.  Id.  Because the ALJ must consider the whole record in reaching his decision, such a failure would undermine his conclusion.  Allen v. Califano, 613 F.2d 139, 145 (6th Cir.1980) (citing Futernick v. Richardson, 484 F.2d 647 (6th Cir.1973)).  When it is evident that the ALJ did not take the proper steps to assess the claimant's credibility, the Court's function is to remand so that those steps may be taken.  See Rogers, 486 F.3d at 249-50.

In the present case, the ALJ clearly indicated that he rejected Ms. Dobrowolski's testimony, but he did not properly explain why he rejected it.  His declaration that "[a]fter considering the evidence, I find . . . [that] her statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely credible," is the sort of single conclusory statement that SSR 96-7p describes as insufficient.  Because this statement does not include "specific reasons for the finding on credibility, supported by evidence in the case record," it does not suffice.  Furthermore, the portion of his opinion that follows this declaration reads less like reasoned analysis and more like a litany of evidence.  The ALJ cited to record evidence that is both favorable and unfavorable to Ms. Dobrowolski.  At no point, however, did he explicitly state that he rejected Ms. Dobrowolski's testimony for the particular reasons that the Commissioner now claims he did.  As a result, because there is no indication that the ALJ in fact addressed Ms.

18

Dobrowolski's credibility in the manner prescribed in the regulations, the Court will require remand.

The Commissioner, nonetheless, argues that the ALJ did properly address Ms. Dobrowolski's credibility.  In particular, he maintains that the ALJ explicitly stated his reasons for rejecting Ms. Dobrowolski's testimony when he noted Ms. Dobrowolski's unremarkable CT, MRI, and EEG test results, Dr. Craciun's remark that "she maintained good but limited control of her headaches", her positive response to the medication Demerol, and Dr. Wax's assessment that Ms. Dobrowolski was malingering and exaggerating symptoms.  (Objections at 4-6; Tr. 19, 21).  However, the ALJ's written opinion is devoid of any reasoned explanation as to why and how this evidence should serve as grounds to discredit her testimony.

First, there is nothing self-evidently discrediting about unremarkable CT, EEG, and MRI scans.  Neither the ALJ's decision nor anything in the record indicates that Ms. Dobrowolski's complaints of pain from migraine headaches are somehow less credible as a result.  For this evidence to be meaningful, there must be some indication that normal test results such as these make it less likely that she experiences the sort of pain of which she complains.  Mere mention of normal test results does not constitute a reasoned explanation for discrediting Ms. Dobrowolski's testimony.

The Commissioner also maintains that the ALJ's remark that Ms. Dobrowolski had positive results from an injection of Demerol during a visit to the emergency room provides sufficient explanation as to why he found her testimony not entirely credible.  (Objections at 5).  According to the Commissioner, her positive response to Demerol suggests that, with medication, Ms. Dobrowolski's condition is not as bad as she

claimed.  Id.  However, the bald assertion that Ms. Dobrowolski had a positive response to Demerol does nothing to undermine her credibility.  If anything, without a reasoned explanation to the contrary, Ms. Dobrowolski's repeated visits to the emergency room and the doctor's decision to prescribe her Demerol for pain appear more consistent than inconsistent with her complaints of disabling pain.

The Commissioner also seems to suggest that the ALJ's remark that Ms. Dobrowolski maintained "good but limited control of her headaches" provides evidence that her headaches were not as limiting as she claimed."  (Objections at 5).  Neither the Commissioner nor the ALJ have explained how this statement is inconsistent with Ms. Dobrowolski's testimony that she suffers from randomly occurring, disabling headaches at least twice a week.  There is no inherent inconsistency between the two, as an individual with "limited control" over her headaches, even when that control is "good," would still be expected to suffer from headaches to the extent that control is limited.

The best the Commissioner does is point to the ALJ's citation of evidence that Dr. Wax suspected Ms. Dobrowolski of malingering.  (Objections at 4).  Even this fails, however, as the ALJ did not explain how or why Dr. Wax's assessment informed *his own finding* that she was not credible.  He simply mentions some of the details of Dr. Wax's report.  He neither indicates why he relied on it nor that he was relying on it at all.  Although this may have seemed self-evident to the ALJ, some minimal explanation as to how Dr. Wax's report served to discredit Ms. Dobrowolski was nonetheless required.

Explanation is especially important here, as certain aspects of Dr Wax's report appear questionable.  For instance, Dr. Wax based his suspicions of malingering, in part, on the ground that Ms. Dobrowolski was vague and apparently annoyed when

20

asked about how she spends her typical day.  (Tr. 304).  While Dr. Wax's observation
that Ms. Dobrowolski was annoyed can only be taken at face value, his contention that
she was vague appears to be undermined by his own report.  The report suggests that
Ms. Dobrowolski was anything but vague when she described her daily activities.  Dr.
Wax reported that she "cooks daily, cooking such things as chicken, hamburgers, and
pastries, including pies. . . . She bathes . . . daily. . . . [She] vacuums two to three times
a day, mops once a week, and cleans the bathroom twice a week."  Id.  She also
reported performing breathing treatments several times a day, watching television,
baking, tending to a flower garden, and going to the grocery store.  Id.  Under SSR
06-03p, Dr. Wax's report is only valuable to the extent that it is supported, and the Court
struggles to find support for the contention that Ms. Dobrowolski was "vague" in
explaining how she spends her days.  Therefore, this portion of the report, absent some
reasonable explanation, cannot provide adequate grounds for the assertion that Ms.
Dobrowolski is malingering.

Finally, the Commissioner points to apparent inconsistencies between statements
about her daily activities made at the hearing on 11 May 2007 and statements made to
Dr. Wax in late 2004.  (Objections at 4).  The Commissioner indicates that according to
Dr. Wax's report Ms. Dobrowolski stated that she was able to care for herself and her
family and that she "cleaned constantly."  Id.  The report also indicates that she cooked,
baked, vacuumed, mopped, and cleaned the bathroom routinely.  Id.  The
Commissioner argues that these statements are inconsistent with her testimony three

years later that "[i]f I feel alright, then I'll vacuum or try to wash some clothes . . . . and if not, then I end up laying around all day, if I don't feel good."  Id.  However, mention of these apparent inconsistencies is notably missing from the ALJ's decision.

The Court agrees with the R&R that the ALJ did not properly consider all the relevant factors under 20 C.F.R. 416.929(c)(3) and SSR 06-03p when making his credibility assessment.  On remand, the Commissioner should consider all those factors which are relevant to assessing Ms. Dobrowolski's credibility.  To the extent they are relevant, the Commissioner should consider the claimant's daily activities; the location, duration, frequency, and intensity of her pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of her medication; and treatment of measures, other than medication, taken to relieve pain.  20 C.F.R. 416.929(c)(3)(i)-(vi).

It is for the ALJ and not this Court to make a finding as to Ms. Dobrowolski's credibility.  While there may be evidence in the record to support the conclusion that Ms. Dobrowolski's testimony was not entirely credible, the Court cannot make such an assessment where the ALJ has failed to demonstrate that he actually considered her credibility pursuant to the regulations.  Because it is evident that the ALJ did not take the proper steps to assess Ms. Dobrowolski's credibility, the Court must order that those steps be taken.

### 3. The ALJ's Residual Functional Capacity Assessment

The Court agrees with the R&R's recommendation that on remand the Commissioner must reevaluate the ALJ's Residual Functional Capacity to the extent that

22

it is affected by the Commissioner's proper consideration of the CMS decision and his proper assessment of the Ms. Dobrowolski's credibility.  The Court further adopts the R&R in all respects related to this issue.

## IV. Conclusion

For the foregoing reasons, the Court adopts Magistrate Judge Limbert's R&R in its entirety and remands to the Commissioner for further proceedings.  On remand, the Commissioner must consider the CMS disability determination and, if he chooses to disregard it, properly provide reasons for so doing.  In addition, the Commissioner must properly assess Ms. Dobrowolski's credibility, and, insofar as he chooses to discount it, provide a reasoned explanation for so doing, pursuant to the Social Security Regulations.  Lastly, the Commissioner must reconsider the ALJ's Residual Functional Capacity ruling to the extent that it is affected by his proper consideration of the CMS finding and his proper assessment of Ms. Dobrowolski's credibility.


IT IS SO ORDERED.

       /s/ Lesley Wells        
UNITED STATES DISTRICT JUDGE

Dated: 27 October 2009

23